**UNITED STATES of America, Plaintiff,**

v.

**Jay GREGORY, Sheriff of Patrick County, Defendant.**

Civ. A. No. 83–0094–D.

United States District Court,
W.D. Virginia,
Danville Division.

April 8, 1988.

John P. Alderman, U.S. Atty., Roanoke, Va., John M. Gadzichowski, Dept. of Justice, Civil Rights, Washington, D.C., and Martin G. Hacala, for plaintiff.

Anthony P. Giorno, Stuart, Va., for defendant.

### MEMORANDUM OPINION

KISER, District Judge.

This case is again before this Court on remand from the Fourth Circuit. The procedural and historical background of this case are found in two opinions of this Court and in two opinions of the Fourth Circuit. Those opinions are, in chronological order, the opinion of this Court filed March 23,

1984;[1] the unpublished opinion of the Fourth Circuit decided October 1, 1985 (slip op. No. 84–1613); the opinion of this Court filed July 18, 1986; and the opinion of the Fourth Circuit decided May 19, 1987.[2]

After receiving the mandate of the Fourth Circuit on its second remand, I held a conference with counsel to define the issues which needed to be resolved. It was determined that the following issues should be briefed and argued by counsel and resolved by the Court:

1. Whether the Defendant (Sheriff) denied employment to Doris Scales, Wanda Hylton, and Kathy Sheppard because they were women;

2. Whether the Plaintiff (Government) is entitled to injunctive relief and, if so, in what form; and

3. Whether the Virginia State Compensation Board is a necessary party defendant.

In addition to the above issues, the Government has raised a subsidiary issue of whether the Court should reopen the record to receive additional evidence for the purpose of fixing damages and fashioning appropriate injunctive relief.

Counsel have fully briefed their respective positions, and on February 5, 1988, I heard oral argument. After oral argument, the Court was advised that the Defendant was abandoning his position that the Virginia State Compensation Board is a necessary party to the proceeding. I had previously ruled on that issue in my July 18, 1986, opinion at p. 11, stating that the Virginia State Compensation Board was not a necessary party to the suit. That ruling will stand.

In my March 23, 1984, Memorandum Opinion, I strongly implied that the United States' proof of discrimination was insufficient. *Gregory,* 582 F.Supp. at 1320. Unfortunately, instead of proceeding to resolve the case on the sufficiency of evidence, *vel non,* I chose to interpret certain provisions of Title VII which I felt were dispositive of the case. But as it has turned out, my interpretation of the statutory provisions was in error. So now I must address the sufficiency of evidence question. In so doing, I make explicit that which was implicit in my earlier opinion—that the Government's evidence fails to prove that but for the gender of Doris Scales, Wanda Hylton, and Kathy Sheppard, the Sheriff would have employed them.

Before turning to the circumstances surrounding the Sheriff's failure to employ each of these women, I will address the Government's argument that the statistical information presented by it shows a pervasive antifemale bias of the Sheriff. In its argument the Government asserts, "From January 1, 1980 through January 20, 1984, the Sheriff of Patrick County filled a total of sixty-three (63) full-time vacancies in PCSD ... all of which were filled by men." Post Trial Brief of Plaintiff at 16. To support this statement, it sets forth a manning chart which shows the date of employment for all employees listed thereon.

The statistics are meaningless. The record is silent as to any female applicants for jobs with the Sheriff's Department other than the four women who have been discussed so we do not know what sort of a labor pool the Defendant had to choose from. The Government implies that because Title VII had been applicable to public employees since 1972 that there was some duty on the Defendant to establish an affirmative action program to recruit or prefer women. But such an argument is untenable in light of the Supreme Court's decision in *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), and the Fourth Circuit's decision in *Wright v. National Archives & Records Service,* 609 F.2d 702 (4th Cir. 1979). Moreover, the statistics are flawed on their face. It is clear that at least 11 of the 22 appointments open to Sheriff Williams were reappointments of employees he inherited from his predecessor. The same holds true as to Sheriff Gregory.

1. *U.S. v. Gregory,* 582 F.Supp. 1319 (W.D.Va. 1984).

2. *U.S. v. Gregory,* 818 F.2d 1114 (4th Cir.1987).

The manning chart shows that his January 1, 1984, appointments, except for two deputies, were inherited from Sheriff Williams' administration.[3] Given the small number of employees in the data base to begin with, the fact that the work force is in great part continued from one four-year term to the next, thereby reducing the Sheriff's opportunity to hire new employees, further diminishes the reliability of the Government's statistics.

In addition to the statistics, the Government has undertaken to prove its case by anecdotal evidence that the three females, Scales, Hylton, and Sheppard, were treated less favorably when being considered for a job than were the males who were hired to fill the job. The Defendant in each instance has articulated nondiscriminatory reasons for his job actions. Thus, it becomes the Plaintiff's burden to prove that the reasons assigned by the Defendant were pretextual and that the real motive for his actions was gender discrimination. *See U.S. Postal Service Bd. of Gov. v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). As in all civil cases, it is the Plaintiff's burden to prove its case by a preponderance of the evidence, that is, that what it seeks to prove is more probably so than not so. *See Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230 (4th Cir. 1982). Thus, the Plaintiff must prove that in each instance that, but for the gender of Scales, Hylton, and Sheppard, she would have been hired for the position she sought. It is in this frame that the evidence of the case must be examined.

*Wanda Hylton:* On March 25, 1981, Wanda Hylton applied for a job with the Patrick County Sheriff's Department. On April 16, 1981, Sheriff Williams hired her as a dispatcher. On November 23, 1981, Hylton resigned her job as dispatcher. Hylton never applied for any other job with the Patrick County Sheriff's Department. (Tr. 144–145). Nor was she sure she would have taken the job of deputy if it had been offered to her. (Tr. 145–146). Hylton testified that the reason she did not apply for a job as a deputy sheriff was that on the date of her application during the course of an interview with Sheriff Williams, she asked him whether he would consider hiring a woman as a deputy. According to her, the Sheriff responded "by chuckling and saying that he would not hire a woman in his department as a deputy, that he did not think women could handle the job, that they could not handle men." (Tr. 139). On this slender thread, the Government charges that the Defendant discriminated against Ms. Hylton.

The context of the statement is important. It was made during a thirty-minute interview at the time of Hylton's application. The pertinent colloquy is as follows:

Q How long did you talk to him?

A About thirty minutes.

Q What—What did you discuss?

A We started out discussing simply our schools. I think we discussed football and basketball. We went from there talking about my degree, the classes that I had taken, my ambitions. At one point I did ask the sheriff if he hired women deputies, and he chuckled and said, no, that he didn't hire women deputies; he didn't think they could handle the job; they couldn't handle the men.

Went on to discuss the fact that if I were seriously interested in law enforcement, it would probably be best if I applied with the state police.

It is obvious that the interview covered a wide range of topics, and was in a lighthearted vein. Even the statement on which the Government relies bears this out—"by chuckling and saying ..." Hylton worked for Sheriff Williams over seven months, and it seems that if he were unhesitating in expressing an anti-female bias to her on one occasion, she would have heard him say something else to the same effect dur-

---

**3.** Under Virginia law, the term of a deputy sheriff expires with the term of the sheriff and to continue in office the deputy must be reappointed. *See U.S. v. Gregory*, 582 F.Supp. at 1320. During his 4 year tenure, Sheriff Williams made only 18 new appointments to the office of deputy sheriff (7 road deputies, 10 corrections officers and 1 courtroom security officer). Sheriff Gregory retained 20 of the 22 people that he inherited from Sheriff Williams and he eliminated one position.

ing that length of time. The fact that she did not greatly undermines the content of the statement. The most probable conclusion is that the statement was made in jest. Certainly, a single statement made with a "chuckle" is hardly a compelling explanation for Hylton's failure to inquire about the availability of other jobs in the Sheriff's Department. The more believable explanation is that she was looking for a job elsewhere that was more suited to her training and education—just as Sheriff Williams surmised. (Tr. 238–39).

In any event, the Hylton matter is considered only for the purpose of determining whether Sheriff Williams had a bias against women in general for it is clear from Hylton's testimony that she wants neither back wages nor a job with the Sheriff's Department. (Tr. 149).

*Doris Scales:* Although stated in the context of deciding the personal staff exemption in the Court's opinion of March 23, 1984, the crucial facts surrounding the Sheriff's decision not to hire Doris Scales were resolved in favor of the Sheriff. In that Opinion, I pointed out, "... being an elected official, the Sheriff must depend upon his deputies to be his eyes and ears as to public sentiment and opinion. Unofficially, it is the deputy's job to know what is going on in his assigned area of the county that might affect the Sheriff favorably or adversely in the eyes of the voting public." *Gregory,* 582 F.Supp. at 1321. The 1984 Opinion then continues to review Deputy Clifford Boyd's testimony, pointing out that he was the deputy who was assigned to the area of Patrick County in which Doris Scales lived, and that there was a lot of opposition in that area to the appointment of Scales to a position in the Sheriff's Office. *See id.* I then found "the Sheriff relied on this information and declined to give Ms. Scales the job." *Id. See also* Tr. pp. 223, 231. The Opinion notes further that "the Government raises an issue about the fact that Ms. Scales was unjustly accused of having a bad moral and credit reputation and asserts there were male deputies with moral or credit records which are just as bad or worse. But this totally misses the point. As an elected official, the Sheriff was concerned with the public's perception—right or wrong—of Ms. Scales." *Gregory,* 582 F.Supp. at 1321, n. 5.

The Government's current position is that Deputy Boyd was so severely impeached by his discovery deposition and during his cross-examination at trial that his testimony is not credible. Specifically, the Government points to the fact that although Boyd testified that Scales reputation was bad in the community, he was unable to recall specifically any persons who had expressed such a view to him. I can no more accept the Government's argument now than I could the first time around. As pointed out above, Deputy Boyd had been placed in a position of trust by the Sheriff, and the Sheriff relied upon him to take and report the pulse of the community. So the question is not whether the underlying information upon which Boyd made his report was accurate, but whether the Sheriff reasonably relied upon the information that Boyd conveyed to him. I find that he did.

Sheriff Williams was adamant in his view that he would not hire Scales for any position. This was not only because of the information he received from Deputy Boyd, but also because of a personality trait—overbearing. In the words of Sheriff Williams, "The impression I got from Mrs. Scales was she was not seeking a job, she was demanding a job." (Tr. 229). From my observation of Scales on the witness stand, I cannot say Sheriff Williams' characterization of her was unjustified.

In addition to the above reasons for not hiring Scales, the Sheriff advanced several other reasons which I consider to be more makeweight than real reasons. For example, her perfume was too strong. These makeweight reasons, however, do not detract from the Sheriff's primary assertion that the reason he failed to hire Scales was because of her bad moral and credit reputation in the area of Patrick County in which she lived. The Government had the burden of proving that sex discrimination was more probable than the reason assigned by the Sheriff, *Lovelace v. Sherwin-*

*Williams, supra,* and this it has failed to do.

*Kathy Sheppard:* During the tenure of Sheriff Williams, Kathy Sheppard was employed as a deputy sheriff with the job assignment of process server. When Sheriff Gregory took office on January 1, 1984, he abolished the position of process server. I have previously found that Sheriff Gregory's explanation that he abolished the position of process server because of budgetary constraints to be a valid nonpretextual reason for his action in dismissing Kathy Sheppard. *See* Memorandum Opinion, July 18, 1986, at 13, n. 1. The Government seems to accept the fact that Sheriff Gregory's action in abolishing the position of process server was not itself a sex-based decision, but argues that the Sheriff should have considered her for some other position in the department. Specifically, the Government urges that because of her seniority, Sheriff Gregory should have considered permitting her to "bump" one of the four male corrections officers. When Sheriff Gregory was asked about this possibility, he responded in part, "I didn't feel that I could knock someone else out of a job, where I felt like they had been doing an adequate job, and that's why I didn't do it." United States' Memorandum for Entry of Judgment at 20 (filed January 11, 1988).

Had Sheriff Gregory chosen to "bump" one of the corrections officers in favor of Sheppard, he probably would have been legally justified in doing so. However, he was not legally required to do so. *See Wright v. National Archives & Records Service,* 609 F.2d 702 (4th Cir.1979). In *Wright* the plaintiff, a black, was competing with a white employee for a desired job assignment. The plaintiff argued that he should have been given preference because of his race. To that argument, the Fourth Circuit responded:

> Thus, it is apparently suggested that with the ability to assign only one trainee

to the Special Projects Staff, defendants' only permissible, i.e., nonpretextual, basis for decision was deliberately to favor a black trainee over the sole white trainee without regard to any other considerations. However that may command itself as a basis for action on principles other than the legal one we enforce, and however legally defensible it might be if done voluntarily, it clearly is not commanded by Title VII.

*Wright,* 609 F.2d at 717 (citations omitted).

The court then went on to cite, with approval, the following language from *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978):

> Title VII prohibits ... having as a goal a work force selected by any proscribed discriminatory practice, but it does not impose a duty to adopt a hiring procedure that maximizes hiring of minority employees.

*Furnco,* 438 U.S. at 577–78, 98 S.Ct. at 2950.

It is true that Sheriff Gregory was not justified in his reasoning that being male was a bona fide job qualification; however, because he assumed the legally valid posture that he would not terminate any of his male corrections officers to make room for Sheppard, the Sheriff has shown that Sheppard would not have been assigned as a corrections officer even if the Sheriff had not been mistaken in his belief that the job required a male to fill it.[4] *See Mt. Healthy School Board v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

The Government advances the same "bumping" argument as to the jobs of dispatcher (this job was filled by both men and women), road deputy, and courtroom security officer, but the Government's argument with respect to these job classifications must fail for the same reason its argument as to corrections officer fails.

---

**4.** Even though the Defendant foreclosed this position to women, it is not decisive of the claims of Scales and Hylton either. As has been discussed, Sheriff Williams would not have hired Scales for any position under any circumstances. Hylton testified she did not know whether she would have accepted such a job or not, and even if she would have at the time she left the Sheriff's Office, she now says she does not want a job with the Sheriff's Department and does not want back wages even if she would have been entitled to them.

The Sheriff was not required to fire another employee to make room for Sheppard.

In sum, I find that the Government has failed to carry its burden of proof that but for the Defendant's invidious discrimination Hylton, Scales, and Sheppard would have been hired (or transferred in the case of Sheppard) into a position in the Sheriff's Department. These findings moot the remaining issues of what relief the Court should grant.

An appropriate Order will be entered.